Filed 5/31/13  In re E.F. CA4/2

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re E.F., a Person Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E057300 |
| Plaintiff and Respondent, | (Super.Ct.No. RIJ120646) |
| v. | **OPINION** |
| D.L.et al., | |
| Defendants and Appellants. | |

APPEAL from the Superior Court of Riverside County.  Matthew C. Perantoni, Temporary Judge.  (Pursuant to Cal. Const., art. VI, § 21.)  Affirmed.

Johanna R. Shargel, under appointment by the Court of Appeal, for Defendant and Appellant D.L.

Pamela Rae Tripp, under appointment by the Court of Appeal, for Defendant and Appellant L.F.

1

Pamela J. Walls, County Counsel, and Julie Koons Jarvi, Deputy County Counsel, for Plaintiff and Respondent.

D.L. (Mother) and L.F. (Father) appeal after the termination of their parental rights to their daughter, E.F., at a Welfare and Institutions Code section 366.26 hearing.[1] They claim on appeal as follows:

1.      Father, joined by Mother, claims that the juvenile court erred by finding that the beneficial parent-child exception of section 366.26, subdivision (c)(1)(B)(i) did not apply.

2.      Father, joined by Mother, contend that the juvenile court erred by finding that the sibling exception pursuant to section 366.26, subdivision (c)(1)(B)(v) did not apply.

We affirm the juvenile court's order terminating parental rights.

## I

## PROCEDURAL AND FACTUAL BACKGROUND

A.    *Detention*

E. was born in April 2008. She had a brother, J.L., who was born in December 2005.[2] Father was the biological father of E.; J. had a different biological father.

---

[1]    All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2]    J. is not a subject of the instant appeal but will be referred to only as it pertains to the detention of E. and the subsequent termination of parental rights.

On November 15, 2010, Riverside County Department of Public Social Services (the Department) received a referral for allegations of physical abuse of J. J. had disclosed to the reporting party that Mother had burned him on the face with a lighter because she was mad at him. J. had an open wound on his lower right jaw. The injury was in a perfect circle and resembled a cigarette burn.

A social worker talked to J. on November 15. J. did not appear to be able to discern between the truth and a lie, but the social worker interviewed him anyway. J. claimed that he was disciplined at home by being burned. The wound was the size of a dime. J. mentioned that Father and Mother frequently argue.

The social worker interviewed Mother and Father. Both denied causing the injury to J. J. had told Mother he received the injury when a friend had stabbed him with an object. When the social worker confronted Mother with the accusation that she burned him with a lighter, she responded, "If that's what [J.'s] saying, then . . . I don't know . . . what can I say?" J. told Father that a neighbor friend stabbed him with a knife. Mother and Father did not investigate the incident.

Mother and Father had been involved in domestic violence in the past, but there were no recent reports of violence. They initially denied any current drug or alcohol abuse. When asked to take a drug test, Father admitted that he had used methamphetamine two times in the previous two weeks. He claimed Mother did not use methamphetamine. Mother later admitted that she and Father used methamphetamine together on November 12, 2010. She admitted that she had spanked E. and J. with a

3

wooden spoon. Father disciplined by spanking them on the bottom. E. had no marks or bruises.

E. and J. were placed with another family member. A child abuse neglect (CAN) examination was conducted on J. The injury to his face was consistent with being burned by a lighter. J. also had patterned scars on his back, abdomen, legs, and arms that were consistent with being hit by a belt. It was concluded by the examining doctor that J. had been physically abused. Mother and Father denied abusing J. Mother was cited for misdemeanor child endangerment. E. and J. were detained and placed together in the same foster home.

Father had some prior convictions, including possession of drug paraphernalia and burglary.

On November 18, 2010, the Department filed a section 300 petition against Mother and Father. It alleged under section 300, subdivision (b) for E. that the parents engaged in domestic violence and abused methamphetamine, which impacted their ability to parent her. In addition, it alleged under section 300, subdivision (j) that J. had been abused and that E. faced a similar risk of harm.

At a detention hearing held on November 19, 2010, the juvenile court found a prima facie case and ordered E. detained. A guardian ad litem was appointed for her. Supervised visitation was ordered for one time a week for one hour.

4

B.    *Jurisdictional/Dispositional Report and Hearing*

In a jurisdictional/dispositional report filed on December 9, 2010, the Department recommended that E. remain in foster care and that Father and Mother be granted reunification services.

On December 1, 2010, the social worker spoke with J., and he again claimed that Mother burned his face with a lighter. E. refused to speak with the social worker. The Department was not given authorization to interview Father and Mother. Father declined to be interviewed, stating, "Just for the fact that we give up information and it will get twisted and misused. That's what happened at the beginning of the case." Mother stated, "It's not in my favor. I hope and pray that the truth comes out."

E. had no developmental delays. She was very shy. At a visit on December 1, 2010, Father was very nurturing toward E. Mother was more focused on talking about her case with the social worker present than on visiting with E. Mother also spoke with the foster mother rather than playing with E. and J.

Mother and Father were both referred to the Family Preservation Center (the FPC) for substance abuse counseling, drug testing, counseling, and parenting. Mother cancelled several appointments, and Father never called the FPC.

The jurisdictional/dispositional hearing was conducted on December 22, 2010. Father and Mother objected to the petition but presented no affirmative evidence. The juvenile court found the allegations in the petition true. Mother and Father were granted six months of reunification services. E. and J. were declared a sibling set.

C.    *Review Reports and Hearings*

In the six-month status review report filed on June 2, 2011, it was recommended that reunification services continue for Father and Mother. E. and J. were placed in a new home on April 14, 2011, due to a change in the prior family's circumstances. The children had transitioned well into the new home.

Mother and Father were not married but had been together for four years. They lived together. Both Mother and Father reported being unemployed and had no source of income.

J. had been reported to exhibit aggressive outbursts and temper tantrums but was otherwise developing normally. On February 14, 2011, J. was diagnosed with oppositional defiant disorder.

E. was developmentally on target. She had good eating and sleeping habits. Although she was shy, once she warmed up to a person, she was talkative.

Mother had attended only one counseling session. She had completed parenting classes. She had failed to attend domestic violence classes. She had missed some of her substance abuse classes but was participating. She tested positive for methamphetamine on January 4, 2011. She was negative on the next three tests but failed to appear for a test on May 18, 2011.

Father had attended only one counseling session. He completed a parenting class. He had not attended domestic violence classes. He was attending some of his substance abuse classes. He tested positive for methamphetamine on February 10, 2011. He tested

negative at one subsequent test, and results were pending for another subsequent test. He, too, failed to appear for a test on May 18, 2011.

In January and February 2011, Father and Mother had been late to visits, brought visitors, and discussed the case details with the children. The visits were moved to be supervised by the Department. E. and J. looked forward to visiting their parents. Father and Mother were loving and affectionate but also redirected the children when necessary. However, they continued to be late to visits and missed one visit.

At the six-month review hearing conducted on July 7, 2011, reunification services were continued for six months despite the juvenile court's concerns regarding the parent's progress on the case plan. Both Mother and Father stated at the hearing that they had been irresponsible but were willing to complete whatever services were necessary to regain custody of the children. The juvenile court warned them that they must complete their services before the 12-month review hearing.

On September 13, 2011, the Department brought an application for psychotropic medication to be administered to J. J.'s violent behavior was "disruptive," and the foster mother was unable to control him. She feared for the safety of E. and other children in the home. The juvenile court ordered administration of the drugs.

The Department filed a 12-month status review report on December 8, 2011, and it was recommended that reunification services be terminated. E. and J. remained together in the same foster home.

7

Mother and Father were unemployed and homeless. They were having problems with their relationship. Mother accused Father of having a romantic relationship with her sister.

J. had behavioral problems. He had been suspended from school a number of times. He got into disagreements over little things with E. and his foster siblings. He told the foster mother he was acting this way in order to get returned to the care of his parents. J. had been seen by a psychologist who stated J. demonstrated defiance, physical aggression, and angry outbursts. His angry behavior had decreased somewhat since he started taking medication. Despite the improvement, the foster mother wanted J. removed from her home.

E. was developing normally and had no emotional issues. It was reported that J. had acted sexually inappropriately with E. J. touched her private areas and made sexual comments to her. He also had pushed her and yelled at her. The foster mother did not leave them alone together. E. was needy and wanted attention due to J.'s actions.

Mother's therapist had recommended that she be referred for possible psychotropic medication due to her depression and behaviors. Mother had failed to get evaluated for the medication. She was inconsistent in her attendance at therapy. She had not completed her domestic violence/anger management course or her substance abuse program. She failed to appear for random drug tests on nine occasions.

Father completed no individual counseling. He did complete some domestic violence classes and some substance abuse counseling. He was eventually dismissed

from the substance abuse program for not following rules. Father also missed nine random drug tests.

During the reporting period, Father and Mother had been more sporadic and inconsistent in their visitation. They had fought in front of E. and J. during a visit. The visits were changed so that Father and Mother attended separately. Unsupervised visits were not possible. When visits did occur, they were appropriate, and the children were happy to see Mother and Father.

The Department was concerned that Mother and Father continued to abuse illegal substances. It was considering separate placement for J. and E. due to J.'s behavior.

On December 22, 2011, the review hearing was held. Mother objected to anything in the reports about her having mental health problems, as she had never been evaluated. Father also objected and argued he was completing some services. The juvenile court terminated reunification services. A section 366.26 hearing was set.

D.      *Separating the Sibling Set*

On February 3, 2012, the Department filed an ex parte application to separate the sibling set. J. had increased his sexualized behavior toward E. since the last hearing. In November 2011, J. snuck into E.'s room, but E. initially denied any sexual abuse. At the end of December 2011, J. was found lying in bed next to E. E. told the foster mother that J. touched her private area. E. reported that J. was "groping" her vagina on several occasions, including the times he was found in her bed. E. reported that she was afraid of J. The juvenile court issued an order granting the request.

9

E.  *Section 366.26 Reports and Hearing*

On April 9, 2012, the Department filed a report for the section 366.26 hearing.  E. was moved to a prospective adoptive home on February 29, 2012, away from J.

Mother reported that she was attending Alcoholics Anonymous/Narcotics Anonymous meetings and living with her sponsor.  J. appeared to be less aggressive due to his new foster home, the medication and counseling.  However, J. had been sexually inappropriate with his foster siblings.

E. was doing well in her new placement.   She had bonded with her new family and was happy.  The family was willing to adopt E.  The Department reported that it was better to keep E. and J. separated.

During this reporting period, Father and Mother had been consistent in monthly visitation, and it had been appropriate.  Mother had arranged a birthday party for J. at one visit.  A continuance was requested and granted in order for an adoptive assessment to be done for the family adopting E.

An addendum report was filed on August 9, 2012.  The Department recommended termination of parental rights to E. and adoption as the permanent plan.  An adoptive home had not been found for J.  E. was in her prospective adoptive home and was thriving.

Mother had missed one of the visitations.  On another occasion she only showed up for the last 10 minutes of a two-hour visit.  Father had also missed one visit.  Moreover, Father had gotten angry with E. at a visit for calling the adoptive parents

10

"mom" and "dad." Visitation between E. and J. was appropriate. E.'s adoptive parents were considering continuing visitation with J. after the adoption as long as he did not act inappropriately.

E.'s adoptive family provided a stable home environment and were a close-knit family. They were open to sibling contact.

On September 13, 2012, the section 366.26 hearing was conducted, as will be set forth in more detail, *post*. Mother's and Father's parental rights to E. were terminated, and she was freed for adoption. E. was "emotional" during her final visit with Mother and Father. Mother and Father thereafter appealed.

II

EXCEPTIONS TO TERMINATION OF PARENTAL RIGHTS

PURSUANT TO SECTION 366.26

Father, joined by Mother, argue that the beneficial parent exception of section 366.26, subdivision (c)(1)(B)(i) and that the sibling exception to adoption under section 366.26, subdivision (c)(1)(B)(v) applied. The juvenile court erred by terminating their parental rights.

A.    *Additional Factual Background*

At the section 366.26 hearing, Father testified. Father claimed when the visits were two times per week, he was consistent with visitation and was on time. At the visits, E. called Father "Papa" or "daddy," she hugged him, and she was happy to see him. She always asked him when she was going back to live with him. She told him that

11

she loved him. E. cried at the end of visitation. Father always brought activities and snacks. He believed there was a strong parent/child bond. Father felt that E. would benefit from continuing the relationship. He asked for legal guardianship.

Father also testified that E. and J. had a strong bond; ongoing contact between them was in their best interests. Father thought it was hard for E. not to be with J. Father insisted that he was consistent with the monthly visitation.

Father argued that the beneficial parental exception applied. He claimed that E. cried at the end of visits and that he acted appropriately during the visits. E. would benefit from continuing the relationship. E. had only been in her current placement for six months, and the bond with Father outweighed the permanency of adoption. Father also argued that the sibling exception applied. E. and J. were raised in the same home and had common experiences. If the juvenile court terminated parental rights, there was no guarantee of keeping up the relationship between E. and J. Mother also argued that there was a parental/child bond and joined in Father's arguments.

The juvenile court found by clear and convincing evidence that "termination of parental rights would not be detrimental to the minor in that none of the exceptions contained in Welfare and Institutions Code Section 366.26 (c)(1), (a) or (b) are applicable to this case . . . ." It was clear to the court that Father loved E. but could not complete the services necessary to reunite him with her. E. had clearly bonded with the adoptive family. The juvenile court also noted that "an important fact" as to the sibling issue was that J. had sexually victimized E. and it was appropriate to keep them separate.

12

B.    *Standard of Review*

At the section 366.26 hearing, the sole issue "'is whether there is clear and convincing evidence that the child is adoptable.' [Citations.]" (*In re Josue G.* (2003) 106 Cal.App.4th 725, 733; see § 366.26, subd. (c).) "Adoption, where possible, is the permanent plan preferred by the Legislature." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 573.) If the court finds that a child may not be returned to his or her parents and is likely to be adopted, it must select adoption as the permanent plan, unless it finds that termination of parental rights would be detrimental to the child under one of the seven exceptions set forth in section 366.26, subdivision (c)(1)(A) and (c)(1)(B)(i) through (v). (See *In re Jamie R.* (2001) 90 Cal.App.4th 766, 773.)

C.    *Parental Benefit Exception*

The parental benefit or "beneficial relationship" exception is set forth in section 366.26, subdivision (c)(1)(B)(i). The exception applies where "'[t]he parents . . . have maintained regular visitation and contact with the minor and the minor would benefit from continuing the relationship.'" (*In re Derek W.* (1999) 73 Cal.App.4th 823, 826.)

"The parent must do more than demonstrate 'frequent and loving contact[,]' [citation] an emotional bond with the child, or that parent and child find their visits pleasant. [Citation.] Instead, the parent must show that he or she occupies a 'parental role' in the child's life." (*In re Derek W., supra,* 73 Cal.App.4th at p. 827.) "The 'benefit' prong of the exception requires the parent to prove his or her relationship with the child 'promotes the well-being of the child to such a degree as to outweigh the well-

13

being the child would gain in a permanent home with new, adoptive parents.' [Citations.]" (*In re K.P.* (2012) 203 Cal.App.4th 614, 621.) "'The burden falls to the parent to show that the termination of parental rights would be detrimental to the child under one of the exceptions. [Citation.]' [Citations.]" (*In re C.B.* (2010) 190 Cal.App.4th 102, 122.)

"We review the trial court's findings for substantial evidence. [Citation.]" (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 228; see also *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314.) "'On review of the sufficiency of the evidence, we presume in favor of the order, considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order.' [Citation.]" (*In re C.F.* (2011) 193 Cal.App.4th 549, 553.) Thus, "a challenge to a juvenile court's finding that there is no beneficial relationship amounts to a contention that the 'undisputed facts lead to only one conclusion.' [Citation.] Unless the undisputed facts established the existence of a beneficial parental . . . relationship, a substantial evidence challenge to this component of the juvenile court's determination cannot succeed." (*Bailey J.,* at p. 1314.)

The juvenile court here summarily denied that the exception applied. It is not clear if it concluded that Father and Mother failed to maintain visitation or if it concluded that there was not a beneficial relationship. The evidence supports both conclusions.

Throughout the proceedings, Mother and Father were inconsistent with visitation. In the first six months, Mother and Father were consistently late to visitation. They

14

brought other visitors to visitations. They missed a visitation. In the 12-month review hearing report, it was reported that they were sporadic and inconsistent in their visitation. Mother and Father fought at a visit.

In the section 366.26 report, the Department noted that Mother and Father had been more consistent in their monthly visits but still missed one visit. Since the visits were monthly, this meant they did not see E. for two months. Mother had shown up for only 10 minutes of one visit. Father had gotten angry at E. during a visit because she was calling the foster parents "mom" and "dad."

While some of the visits were appropriate and E. looked forward to them, the record establishes that Mother and Father missed several visitations and had been late to many visits. They argued at visits. The juvenile court certainly could have concluded that Father and Mother had not maintained consistent visitation.

Moreover, even if the juvenile court found that Father and Mother maintained consistent visitation, they cannot prove their relationship with E. benefitted her to such a degree as to outweigh the well-being she would gain in a permanent home with adoptive parents. (*In re K.P., supra,* 203 Cal.App.4th at p. 621.) "The factors to be considered when looking for whether a relationship is important and beneficial are: (1) the age of the child, (2) the portion of the child's life spent in the parent's custody, (3) the positive or negative effect of interaction between the parent and the child, and (4) the child's particular needs." (*In re Angel B.* (2002) 97 Cal.App.4th 454, 467, fn. omitted.) Mother and Father did not show that their relationship with E. was important and beneficial.

Father and Mother came to the attention of the Department due to serious injuries on J. from where Mother burned him with a lighter. He had other marks that were evidence of past physical abuse. E. faced the potential of being physically abused if she remained in the custody of Father and Mother. Mother was abusive, and Father apparently did nothing to stop her.

Additionally, Mother and Father had tested positive for methamphetamine once during the proceedings, and they each missed nine drug tests. The juvenile court could reasonably be concerned that Father and Mother were using methamphetamine. If they were using drugs, they could not provide a stable home environment for E.

The record certainly shows that E. had an emotional attachment with her parents, and especially Father. Nevertheless, this attachment did not meet her needs, and she faced harm by remaining in the care of Father and Mother.

Moreover, even if Mother and Father could establish a beneficial relationship, they cannot show that termination of the parental relationship was detrimental to E. (*In re Bailey J., supra,* 189 Cal.App.4th at p. 1315.) We review this determination under an abuse of discretion standard. (*Ibid.*)

E. was thriving in her adoptive home. She no longer was being sexually abused by J. and did not face the threat of being abused by Mother. Father and Mother certainly could be continuing to abuse drugs as they failed to drug test. Based on the foregoing, the juvenile court did abuse its discretion by finding that the parental benefit exception did not apply in this case.

16

D.    *Sibling Exception*

Father, joined by Mother contend that the juvenile court erred by finding that the sibling exception to adoption pursuant to section 366.26 subdivision (c)(1)(B)(v) did not apply.

Section 366.26, subdivision (c)(1)(B)(v) provides an exception to the termination of parental rights if the court finds a compelling reason for determining that termination would be detrimental to the child due to a "substantial interference with a child's sibling relationship, taking into consideration the nature and extent of the relationship, including, but not limited to, whether the child was raised with a sibling in the same home, whether the child shared significant common experiences or has existing close and strong bonds with a sibling, and whether ongoing contact is in the child's best interest, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption." (§ 366.26, subd. (c)(1)(B)(v).)

The juvenile court undertakes a two-step analysis in evaluating the applicability of the sibling relationship exception. First, the court is directed "to determine whether terminating parental rights would substantially interfere with the sibling relationship by evaluating the nature and extent of the relationship, including whether the child and sibling were raised in the same house, shared significant common experiences or have existing close and strong bonds. [Citation.] If the court determines terminating parental rights would substantially interfere with the sibling relationship, the court is then directed to weigh the child's best interest in continuing that sibling relationship against the benefit

17

the child would receive by the permanency of adoption." (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 951-952.) "[T]he concern is the best interests of the child being considered for adoption, not the interests of that child's siblings." (*In re Naomi P.* (2005) 132 Cal.App.4th 808, 822.)

"Indeed, even if adoption would interfere with a strong sibling relationship, the court must nevertheless weigh the benefit to the child of continuing the sibling relationship against the benefit the child would receive by gaining a permanent home through adoption. [Citation.]" (*In re Celine R.* (2003) 31 Cal.4th 45, 61.) We review the court's finding on this issue for substantial evidence. (*In re L.Y.L., supra,* 101 Cal.App.4th at p. 953.)

The evidence establishes that E.'s need for a permanent, stable home away from J.'s explosive and sexual behaviors outweighed any sibling relationship.

Here, J. and E. did initially live in the same home together until they were detained when E. was two years old and J. was five years old. They were also initially placed in the same foster home and declared a sibling set. However, they had to be separated and the sibling set was dissolved because J. was sexually inappropriate with E. J. would sneak into E.'s room and touch her vagina. He also made sexual comments to her. J. pushed E. and yelled at her. E. was afraid of J. Although there was some bond between J. and E., the damage to E. was immeasurable if she remained with J.

Father contends that J. never touched E. at the visitations. However, these visits were supervised. Moreover, when J. touched E., he snuck into her room in the middle of

18

the night. The juvenile court could reasonably conclude that J. had acted inappropriately with E.

In addition to the sexually inappropriate behavior, J. continued to escalate his violent behavior throughout the dependency proceeding. J. had trouble with his various foster parents who could not control him. Even after termination of parental rights to E., J. had to be moved out of his placement due to aggressive behavior. He left bruises on the foster mother's arm, and the foster parents called law enforcement because they could not control J. E. was becoming needy due to J.'s violent behavior. Once E. was moved to the adoptive home away from J., she began to thrive.

Finally, the adoptive parents of E. agreed to maintain some sort of sibling relationship between E. and J. assuming that he did not act inappropriately with her. As such, some sibling relationship would be maintained.

Based on the foregoing, we conclude substantial evidence supports the juvenile court's decision not to apply the sibling exception to the termination of parental rights in this case.[3] The juvenile court properly terminated parental rights for Father and Mother.

---

[3] Mother makes an additional claim that if we reverse the termination of Father's parental rights, we must reverse the termination of her parental rights. Since we uphold the juvenile court's order, we need not address the issue.

### III

### DISPOSITION

The juvenile court's orders are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RICHLI
J.

We concur:

RAMIREZ
P. J.

HOLLENHORST
J.